RALPH J. DEMEO ET AL. v. ZONING COMMISSION OF THE
CITY OF BRIDGEPORT ET AL.

BALDWIN, C. J., KING, MURPHY, MELLITZ and SHEA, Js.

Argued November 3, 1960—decided January 24, 1961

*Milton E. J. Reinhard, Jr.,* with whom were *John J. Relihan* and, on the brief, *Hugh C. Curran,* for the appellant (defendant Telson Studios, Inc.).

*Raymond W. Beckwith,* for the appellees (plaintiffs).

MELLITZ, J. The defendant Telson Studios, Inc., applied to the defendant zoning commission of the city of Bridgeport for a change of zone, from residence A to garden apartment, of a tract of land located in the north end of Bridgeport. The commission held a public hearing, after due notice and

after it had examined the premises and the surrounding area. All interested parties were heard. The plaintiffs, neighboring residents and property owners, presented objections to the application. The commission voted unanimously to grant the application and assigned eight reasons for its action, in accordance with the requirement that a zoning commission shall state on its records its reasons why a change of zone is made. General Statutes § 8-3; Bridgeport Zoning Regs., c. 21, § 1. The plaintiffs appealed to the Court of Common Pleas, attacking the commission's action on a number of grounds, among them, primarily, that it constituted spot zoning and did not conform to the policies expressed in the master plan of land use of the city. The court sustained these contentions and rendered judgment sustaining the appeal. Telson Studios, Inc., hereinafter referred to as the defendant, has appealed from that judgment.

The history of zoning in Bridgeport is detailed in *Levinsky* v. *Zoning Commission,* 144 Conn. 117, 123, 127 A.2d 822, and need not be repeated here. The comprehensive plan for the use and development of property in Bridgeport is found in the scheme of the zoning regulations which were adopted by its zoning commission. Ibid.; *Couch* v. *Zoning Commission,* 141 Conn. 349, 355, 106 A.2d 173. The zoning regulations governing the present case, and the zoning map which accompanied them, were adopted in 1949 and divided the city into a number of zones. Chapter 3 of the regulations provides for residence AA and residence A zones, and chapter 4 provides for residence B and residence BB zones. In chapter 5, the standards for a garden apartment zone are set forth, and a garden apartment development is defined. The buildings in a garden apartment de-

velopment may not occupy more than 25 per cent of the land, and the remainder of the land, except for portions devoted to parking, must be appropriately landscaped. The height of buildings is limited to two and one-half stories, and the minimum front yard, side yard, and rear yard requirements, as well as the use limitations, are those applicable to a residence A zone. Although the standards for garden apartments are prescribed, no specific areas have been designated on the zoning map as garden apartment zones. In § 9 of chapter 5 of the regulations, it is provided that no land shall be placed in a garden apartment zone except upon petition of the owner; that a development on land so zoned must be in accordance with the layout, plans and specifications for buildings and plan for landscaping which, after their presentation at the hearing on the petition, receive the approval of the commission; that the commission may impose conditions and limitations on the location of parking areas, on front, side and rear yards to be provided in excess of the minimum requirements, and on the distances between buildings; and that when a development is once approved, it shall not thereafter be altered or changed except with the approval of the commission after a public hearing. Thus, the commission retains control over the building of garden apartments and the location of garden apartment zones in the city.

In each case, a garden apartment zone, if it is to be created, must be carved out of another, existing, zone and necessitates a change of zone to permit its establishment. The reason for this policy and the purpose sought to be achieved is set forth in § 8 of chapter 5 of the regulations, which is entitled "Declaration of Necessity" and reads as follows: "In

the adoption of this regulation, it is contemplated that Garden Apartment Zones will, if established under this chapter, be located in the better residential areas of the City, and it is recognized that the apartment development of such areas may have a detrimental effect upon surrounding residential properties and a retarding influence upon the normal development of such surrounding properties unless such apartment development is carefully supervised and regulated. It is, in consequence, hereby declared as a matter of legislative determination that it is necessary, in the promotion of the public health, safety and welfare and in the accomplishment of the purposes set forth in Chapter 1 of these regulations, that the limitations contained in this chapter be adopted and that the Zoning Commission retain the control over the development of land in Garden Apartment Zones which is provided in the following section [§ 9 of Chapter 5]."

How best the purposes of zoning can be accomplished in any municipality is primarily in the discretion of its zoning authority, and that discretion is a broad one. *Bartram* v. *Zoning Commission,* 136 Conn. 89, 96, 68 A.2d 308. The view of the zoning commission in Bridgeport, reflected in its plan of zoning, is that a need exists in the community for apartments of the type described as garden apartments, and that to attract developers, as well as tenants for such accommodations, the facilities must be located in the better residential areas of the city, that is, in residence AA or residence A zones. The commission must have recognized also that the construction of such housing must be privately financed and, to be undertaken, must yield a fair return on the investment. It was apparently felt that potential tenants of such apartments would look for the

equivalent of the living accommodations found in houses in the better residential areas and that to attract such tenants, a developer would seek to locate in such an area. The commission recognized, however, that there could be a detrimental effect on surrounding properties, so that it was essential for the commission to retain a tight control over each development, to consider each proposed location individually, and, if the location appeared otherwise suitable, to impose such conditions as the commission might find necessary for the protection of the interests both of the surrounding property owners and of the developer.

Thus, as already pointed out, the creation of a garden apartment zone pursuant to the zoning regulations requires a change of zone. A new zone must be carved out of an existing one. The zone out of which the commission created the new garden apartment zone under consideration here is a residence A zone. Such a change of zone is contemplated in the comprehensive plan reflected in the zoning regulations. It is not an instance of illegal spot zoning. To constitute spot zoning, in the sense of an illegal exercise of power on the part of the zoning authority, a change of zone must be out of harmony with the comprehensive plan for zoning adopted to serve the needs of the community as a whole. *Guerriero* v. *Galasso*, 144 Conn. 600, 607, 136 A.2d 497; *Levinsky* v. *Zoning Commission*, 144 Conn. 117, 125, 127 A.2d 822. The controlling test must be the good of the community as a whole, and any change of zone can only be made if it falls within the requirements of the comprehensive plan for the use and development of property in the municipality or a large part of it. *Kuehne* v. *Town Council*, 136 Conn. 452, 461, 72 A.2d 476. If the change is in accordance with the

comprehensive plan and the predominating purpose in making the change is to benefit the community as a whole rather than the owner of the land, the action of the commission is not unreasonable or arbitrary and does not constitute spot zoning, although the owner may receive an incidental benefit. *Levinsky* v. *Zoning Commission, supra.*

The commission, in granting the application, assigned these reasons for its action: The proposed development was fully in accord with the "Declaration of Necessity" in chapter 5, § 8, of the regulations and with the master plan of land use; all public utilities and public services were readily available; the surrounding area was interspersed with nonconforming two- and three-family residential uses; the change of zone was an upgrading from the previous use of the property and would tend to stabilize the over-all residential development of the area; the proposed development, with the controlled plans to which the developer would have to adhere, would have no detrimental effect upon the surrounding areas; and the change represented the most appropriate use of the land and was in complete harmony with the spirit and intent of the zoning regulations. The record returned by the commission supports, fairly and reasonably, these assigned reasons. The tract of land involved contains approximately 4.16 acres and is now vacant. Whether it lends itself to a subdivision into building lots, in view of the shape of the tract and the minimum width and area requirements for lots in a residence A zone, is doubtful. It was last used for a commercial greenhouse and gardens, a nonconforming use. While there is a preponderance of one-family dwellings in the area, there are also in the vicinity many two-family and some three-family dwellings,

as well as two stores immediately to the south of the tract, all of which are nonconforming uses. Within 1600 feet there are a number of stores and a motion picture theater. From a population standpoint, the area is of medium density. The buildings to be erected in the development will be two and one-half stories high and are designed to blend architecturally with the neighborhood. Shrubbery will be planted, and the entire site appropriately and attractively landscaped. The buildings will occupy 23.2 per cent of the land and contain ninety-two apartments. Play areas for children are provided, and there will be 101 paved, off-street parking spaces. All public utilities and public services, including sanitary and storm sewers, are readily available to the site. Upon the record before it, the commission was warranted in concluding that the area was a suitable one for the creation of a garden apartment zone, within the provisions of chapter 5 of the regulations.

In voting to change the zone of the area, the commission was exercising a legislative function. *Burke* v. *Board of Representatives,* 148 Conn. 33, 38, 166 A.2d 849; *Kutcher* v. *Town Planning Commission,* 138 Conn. 705, 709, 88 A.2d 538, and cases cited. When zoning authorities act within their prescribed legislative powers, they have a wide and liberal discretion. Courts cannot interfere with its exercise unless it clearly appears that it has been abused. *Clark* v. *Town Council,* 145 Conn. 476, 488, 144 A.2d 327. When the considerations are fairly debatable, the court cannot substitute its judgment for that of the commission. *Kutcher* v. *Town Planning Commission,* supra. Here, the change of zone has the effect of permitting an intensified residential use of the land, in harmony with the comprehensive plan

for zoning in effect in the city. It was a change of zone within the discretion of the commission to make, and it did not constitute illegal spot zoning.

The contention of the plaintiffs that the action of the commission was invalid because it was not in conformity with the master plan of land use discloses a misconception of the place of the master plan in the zoning scheme of the city. See *Levinsky* v. *Zoning Commission,* 144 Conn. 117, 123, 127 A.2d 822. The master plan for Bridgeport was adopted in 1952. It did not purport to operate, nor did it operate, to control the action of the zoning commission under the zoning regulations. The master plan itself recites that it is "an *advisory,* rather than a *regulative,* instrument"; that its main function will be as a guide for the future development of the city and, as such, an aid to the zoning commission; and that it "will *not* be a final declaration of how the city is to develop." Bridgeport Master Plan of Land Use, p. 2 (1952). It suggests that "[a] possible trend toward Garden Apartment and Residence Apartment projects in the outer low-density sections would speed the population increase there and tend to average the city-wide density pattern." Id., p. 13. It, however, also refers to the permissibility of locating a garden apartment zone in a medium-density area. Ibid. The low-density classification covers up to twenty persons per residential acre, and the medium-density classification covers twenty to fifty persons per acre. The area involved here is, as was pointed out, a medium-density section, and the zoning commission believed that its action was consistent with the master plan. There was a basis in the master plan for this view, but, whether or not the commission was correct, the validity of its action was dependent only upon its being in

harmony with the comprehensive plan found in the zoning regulations. Lack of conformity with a view or suggestion expressed in the master plan would not, under the circumstances here, properly form the basis for a finding of invalidity in the commission's action.

There is error, the judgment is set aside and the case is remanded with direction to dismiss the appeal.

In this opinion the other judges concurred.